# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Elaine E. Bucklo | Sitting Judge if Other than Assigned Judge | Arlander Keys |
|---|---|---|---|
| **CASE NUMBER** | 01 C 873 | **DATE** | 3/29/2002 |
| **CASE TITLE** | Compuware Corporation vs. Health Care Service Corp. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  Report and Recommendation regarding Health Care Service Corporation's First and Second Motions for Rule to Show Cause and for Sanctions is hereby submitted to Judge Bucklo. It is recommended that these Motions be granted. *AK*

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| ✓ | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| | Docketing to mail notices. |
| | Mail AO 450 form. |
| ✓ | Copy to judge/magistrate judge. |

6
number of notices

APR 0 1 2002
date docketed

3/29/2002
date mailed notice

FT/*peay*
courtroom deputy's initials

2002 MAR 29 PM 3:05

CLERK U.S. DISTRICT COURT

Date/time received in central Clerk's Office

FT
mailing deputy initials

**Document Number**

74



DOCKETED

APR 0 1 2002

COMPUWARE CORPORATION,  )    Case No. 01 C 0873
a Michigan Corporation,   )
                             )
            Plaintiff,   )    Judge Elaine Bucklo
                             )
       v.                  )
                             )    Magistrate Judge
HEALTH CARE SERVICE CORPORATION   )    Arlander Keys
a mutual legal reserve company    )
doing business as                 )
BLUE CROSS BLUE SHIELD OF ILLINOIS,)
UNITECH SYSTEMS, INC., an Illinois )
Corporation; and VARIOUS JOHN     )
DOES,                         )
               Defendant.   )

TO:    THE HONORABLE Elaine Bucklo
       UNITED STATES DISTRICT JUDGE

### REPORT AND RECOMMENDATION

Currently before the Court are Defendant Health Care Service Corporation's First and Second Motions For Rule to Show Cause and For Sanctions. For the reasons set forth below, the Court recommends granting these Motions.

### BACKGROUND

In February, 2001, Compuware Corporation ("Compuware") sued Defendants for misappropriation of trade secrets and breach of contract. From 1984 until 2000, Compuware had licensed to Health Care Service Corporation ("Blue Cross") certain computer software programs. After Blue Cross declined to renew its licensing agreement with Compuware, Compuware filed this federal lawsuit, claiming that Blue Cross had breached their contract and

74

misappropriated Compuware's trade secrets. Compuware alleges that, while its licensing agreement with Blue Cross was in effect, Blue Cross entered into a separate agreement with Unitech Systems, Inc. ("Unitech"), whereby Unitech paid Blue Cross a fee to access Blue Cross' mainframe and certain software programs, including Compuware's software programs.

On October 18, 2001, Judge Bucklo referred the matter to this Court to address both Compuware's and Blue Cross' Motions to Compel. At oral argument on October 26, 2001, Compuware asked the Court to compel Blue Cross to produce its third-party software licensing agreements for all of the software programs that Unitech had accessed.[1] The Court granted that Motion in part, compelling Blue Cross to identify certain information contained in those agreements, without requiring Blue Cross to produce the actual agreements. Neither party has raised an issue with regard to Blue Cross' compliance with this portion of the Court's ruling.

---

[1] Compuware initially requested that Blue Cross produce all of its software licensing agreements with third parties (that is, with companies other than Compuware), regardless of whether Unitech actually had used the corresponding software. Compuware argued that these agreements were critical to establishing its damages. Compuware posited that, because Unitech paid Bluecross for using Blue Cross' mainframe and software, if Compuware's software was the only software that Unitech used, then Compuware should be entitled to recover the entire fee that Unitech paid to Blue Cross. Conversely, if Unitech had accessed numerous other software programs, licensed by third parties, then Compuware's measure of damages would have to be adjusted.

## A. The Court's Rulings On Blue Cross' Motion To Compel

Blue Cross' Motion to Compel was twofold, and it is Compuware's compliance with the Court's rulings on that Motion that is the subject of the current debate. Blue Cross moved to compel Compuware: 1) to more fully respond to an interrogatory requesting that Compuware identify its trade secrets ("Interrogatory No. 5"); and 2) to produce Compuware's third-party licensing agreements. The Court addressed the former request in open court, and reserved ruling on the latter request. With regard to Interrogatory No. 5, the Court rejected Compuware's assertion that each of its software programs was, in and of itself, a trade secret, and ordered Compuware to more specifically identify each trade secret that Blue Cross and Unitech had allegedly misappropriated.

With regard to Compuware's third-party license agreements, the Court stated that the documents were clearly relevant, and asked Compuware to explain why it should not be required to produce these documents. Compuware argued that such a production would be unduly burdensome, would disrupt its business, and would impose a significant and unnecessary cost on Compuware. The Court expressed its disbelief that such a large computer company[2] would not be able to access those documents more readily, and ordered Compuware to submit an affidavit from a knowledgeable corporate officer to

---

[2] Compuware identified itself as one of the largest software companies in the United States.

support its assertion that the production would be so burdensome that Compuware should not be compelled to produce these documents.

Compuware subsequently submitted the affidavit of Vic Wojick, Compuware's Director of Contracts and Negotiations. In his affidavit, Mr. Wojick stated that, in order for Compuware to comply with Blue Cross' request, "it would take three people at least three weeks, working full time, to identify the files containing relevant license agreements, and then to remove, copy and restore the license agreements and schedules." Wojick Aff. ¶ 8. Mr. Wojick speculated that the production would involve approximately 29,000 agreements, and complained that this process would substantially interfere with Compuware's daily operations, because Compuware employees routinely accessed these files on a daily basis. Mr. Wojick suggested that Compuware could produce representative copies of its form license agreement instead.

On November 30, 2001 the Court issued a Minute Order, compelling the production of Compuware's third-party license agreements. The Court found that, even accepting Mr. Wojick's representations as true, Blue Cross' need for the license agreements outweighed Compuware's burden of producing them. The Court explained that Blue Cross needed these agreements to: 1) determine whether Compuware took steps to protect its trade secrets; and 2) assess Plaintiff's damages estimate. Because Blue Cross had offered

to share Compuware's cost of producing these agreements, the Court incorporated Blue Cross' suggestion into its Order.

**B.  Compuware's Attempts to Comply With The Court's Order Directing Compuware to Specifically Identify Its Trade Secrets.**

In the interim, Compuware purportedly complied with this Court's October 26th ruling, which ordered Compuware to more specifically identify its trade secrets.  On November 13, 2001, Compuware served Blue Cross with its Supplemental Response to Interrogatory No. 5 and Trade Secret List ("Supplemental Response").  Compuware's Supplemental Response identified 213 individual trade secrets contained in three of the twelve software products identified in its Complaint.

In a letter dated November 29, 2001, Blue Cross complained to Compuware that its Supplemental Response failed to comply with the Court's October 26th ruling in the following respects: 1) Compuware's response merely identified the software programs' functions and failed to sufficiently identify its trade secrets; 2) Compuware's response failed to identify any trade secrets in nine of the twelve software products identified in Compuware's Complaint; and 3) Compuware failed to produce certain trade secret documents, such as source codes.

Blue Cross scheduled a Local Rule 37.2 telephone conference for December 6, 2001, in an attempt to resolve the parties' disagreement over whether Compuware's Supplemental Response

adequately identified its trade secrets. During the December 6th phone conference, Compuware denied that the Court had ordered it to identify its trade secrets in a more specific manner and explained that it was standing by its Supplemental Response. Compuware acknowledged that many of its descriptions could not be understood without referencing certain trade secret documents, and suggested that Blue Cross hire an expert to decipher its Supplemental Response. Blue Cross sent Compuware a letter dated December 19, 2001 requesting that Compuware reevaluate its position; Compuware declined.

## C. Compuware's Attempts to Comply With The Court's November 30, 2001 Order.

In addition to debating the adequacy of Compuware's Supplemental Response, Blue Cross took issue with Compuware's failure to produce its third-party licensing agreements, which were the subject of the Court's November 30, 2001 Minute Order. Blue Cross contacted Compuware on December 6, 2001, and again on December 19th to determine the status of the production of these agreements, and offered to travel to Michigan to obtain these files.

Shortly thereafter, Compuware advised Blue Cross that approximately 5,000 of the 29,000 licensing agreements were available on two CDs. On December 27, 2000, Compuware produced these CDs, and Blue Cross agreed to review them. As to the remaining agreements, Compuware took Blue Cross up on its offer

6

to send representatives to Compuware's headquarters in Michigan
to retrieve and/or view the agreements.

Blue Cross noted that the existence of these CDs directly
contradicted Mr. Wojick's affidavit, in which he testified that
it would take approximately 360 man hours to scour through
Compuware's files by hand and copy the relevant agreements.  When
Blue Cross attempted to depose Mr. Wojick in mid-December,
Compuware informed Blue Cross that Mr. Wojick was no longer
employed by Compuware.

On January 25, 2002, Blue Cross advised Compuware that the
CDs failed to provide the full discovery as ordered by this Court
on November 30, 2001.  Blue Cross demanded that Compuware produce
all of its third-party licensing agreements.  Not surprisingly,
Compuware disagreed with Blue Cross' interpretation of this
Court's Order, stating that the production of the CDs met the
spirit, if not the letter, of this Court's Order.

On February 13, 2002, and again on February 15th, Blue Cross
stressed to Compuware that its failure to produce the third-party
licensing agreements was seriously hampering Blue Cross' ability
to conduct discovery.  On February 18, 2002, Compuware
represented to Blue Cross that it was in the process of obtaining
copies of the agreements documented on the two CDs, that these
copies would be made available to Blue Cross on a rolling basis,
and that the copying company would bill Blue Cross directly.  The

next day, Blue Cross contacted Compuware to make certain that the production would include all, and not merely a subset, of the licensing agreements. Compuware assured Blue Cross that the current copying was all-inclusive and was ongoing.

Compuware then backed away from its previous assertions, and informed Blue Cross that it had not and would not begin copying the licensing agreements until Blue Cross assured Compuware that Blue Cross would pay its share of the copying costs. Even more surprising was Compuware's revelation on March 5, 2002, that Compuware would disclose not only the two CDs, but also 7,500 sheets of microfiche, which apparently documented the remaining licensing agreements. This was the first time that Compuware had acknowledged that its agreements were available on microfiche.

### D. Blue Cross' First Motion For Rule To Show Cause and For Sanctions.

On January 18, 2002, Blue Cross filed its first Motion for an Order to Show Cause and for Sanctions ("First Motion"). Blue Cross asks the Court to sanction Compuware, pursuant to Fed. R. Civ. P. 37, for failing to comply with the Court's October 26, 2001 Order compelling Compuware to specifically identify the trade secrets that Blue Cross and Unitech had allegedly misappropriated.[3] Blue Cross notes that, during the October 26th

---

[3] Blue Cross also took issue with Compuware's failure to produce certain trade secrets documents, such as manuals and source codes. Compuware retorted that Blue Cross already had

hearing, the Court rejected Compuware's untenable assertion that all of its software programs, in their entirety, were trade secrets, and directed Compuware to specifically identify each of its trade secrets. Blue Cross contends that Compuware's attempt to comply with that Order, via its Supplemental Response to Interrogatory No. 5, was inadequate because it merely listed - in a convoluted manner - the numerous functions and features of only three of the twelve Compuware software programs at issue. Blue Cross requests that the Court require Compuware to pay Blue Cross' costs and expenses for bringing this Motion, and to fine Compuware $10,000.

Compuware responds by attacking Blue Cross' Motion as a thinly veiled attempt to detract attention from Blue Cross' own inappropriate conduct, and proceeds to offer its version of the merits of the underlying litigation.[4] Compuware describes its failure to more specifically identify its trade secrets as an

---

most, if not all, of these documents in its possession, as Compuware had routinely forwarded these materials during the life of the parties' contractual relationship. The parties have apparently resolved their dispute with regard to these documents, as they were not discussed at the March 6th hearing, or in either party's briefing on Blue Cross' Second Motion for Rule to Show Cause.

[4]Compuware's response is filled with rhetoric more properly reserved for jury argument. Not only is Compuware's recitation of the merits of the underlying case a misplaced response to a discovery motion, but it is devoid of legal citation and, in some instances, overstates the relevant law. As such, it is not even appropriate for jury argument.

"alleged technicalit[y]." In response to Blue Cross'
characterization of the Supplemental Response as unintelligible
and convoluted, Compuware argues that Blue Cross should be
required to hire an expert to decipher Compuware's Supplemental
Response prior to bringing a Rule 37 Motion.

Moreover, Compuware contends that the Court's Order only
required Compuware to identify the trade secrets found in its
File- AID, Abend-AID, and Xpediter software programs, because,
during discovery, Unitech had admitted to using only those three
products. As such, Compuware argues, it is not required to
identify the trade secrets in the other nine products listed in
its Complaint. Compuware resists Blue Cross' demand that the
claims involving these nine products be dismissed with prejudice,
however, claiming that it should nevertheless be entitled to
proceed on these claims in the event that evidence arises during
discovery indicating that Unitech used one or more of these nine
software products.

On March 6, 2002, this Court heard argument on Blue Cross'
Motion. The Court subsequently issued a Minute Order, which
addressed some, but not all, of Blue Cross' Motion. Given the
rapidly approaching discovery deadline, the Court ordered
Compuware to more specifically identify its trade secrets. The
Court found that Compuware's Supplemental Response failed to
identify its trade secrets with sufficient specificity to permit

meaningful comparison of Compuware's purported trade secrets with prior art or information generally known in the field. The Court directed Compuware to submit a more detailed description of its trade secrets on or before March 18, 2002.

In addition to the debate over Compuware's Supplemental Response, Blue Cross informed the Court that Compuware had yet to comply with the Court's November 30, 2001 Order directing Compuware to produce its third-party licensing agreements. Blue Cross explained that, contrary to Mr. Wojick's affidavit, the documents were allegedly available on either CDs and/or microfiche, but that Compuware had, nevertheless, failed to produce them. Compuware responded that it was merely waiting for confirmation from Blue Cross that it would pay its share of the copying costs before undertaking this project.

The Court rejected Compuware's excuse that the possibility that Blue Cross might renege on its promise to pay one-half of the copying costs justified Compuware's failure to comply with this Court's November 30th Order. The Court ordered Compuware to produce the lease agreements to Blue Cross by March 13, 2002. The Court reserved judgment on Blue Cross' request for fees and sanctions, and addresses that request in this Report.

### E. Blue Cross' Second Motion For Rule to Show Cause and For Sanctions.

On March 12, 2002, Compuware advised Blue Cross that it was providing Blue Cross with only the CDs, which contained a subset

11

of its licensing agreements.  Compuware further agreed to permit Blue Cross to review its microfiche, which contained the remaining licensing agreements.  Contrary to its representation the day before, Compuware produced to Blue Cross copies of Compuware's microfiche just prior to the expiration of the Court-imposed March 13th deadline.  For Blue Cross, Compuware's production was a case of too little, too late; Blue Cross filed its second Motion For Rule to Show Cause and For Sanctions on March 13, 2002.[5]

In this Motion, Blue Cross complains that Compuware's belated production is devoid of even a single hard-copy of the tens of thousands of licensing agreements at issue.  Given the amount of time and effort required to identify and reproduce the relevant materials from these CDs and microfiche, Blue Cross contends that it is impossible for Blue Cross to obtain the information it needs, and prepare for and conduct depositions prior to the close of discovery.

---

[5] When Blue Cross filed its Second Motion, it was still under the impression that Compuware would only permit Blue Cross to inspect its microfiche.  It is not clear that Compuware informed Blue Cross that it was forwarding the microfiche until Blue Cross actually received the copies of Compuware's microfiche at approximately 5:15 p.m. on March 13, 2002.  Compuware claims that it was unable to secure the copying company's (AIKON@) commitment that the microfiche would all be copied on time, which was why it initially limited Blue Cross to inspecting Compuware's original microfiche.  When IKON was able to complete the task on the afternoon of March 13th, Compuware immediately forwarded copies of the microfiche to Blue Cross.

Compuware concedes that copying the documents from the CDs and microfiche will be a costly and lengthy endeavor, but insists that it disclosed at the March 6th hearing -- without objection from Blue Cross or the Court -- that it was producing the documents in this format because of the cost and time involved in producing hard copies of the licensing agreements.

On March 18, 2002, Compuware filed its Second Supplemental Response to Blue Cross' Interrogatory No. 5 and Trade Secret List. Compuware included with this filing a number of explanatory exhibits, including the source codes that Blue Cross had previously requested. While Compuware's submission is lengthy and detailed, it is limited to the trade secrets contained in its File-AID, Abend-AID, and Xpediter products.

After reviewing the parties' briefs, the transcripts of the hearings, and the applicable law, the Court rescinded its prior order directing Blue Cross to share in the expense of copying Compuware's licensing agreements. *See* March 18, 2002 Minute Order.

## Discussion

Before analyzing the merits of Blue Cross' Motions, the Court sets forth the standards that guide its recommendation.

## I. Standards for Rule 37 Sanctions

Federal Rule of Civil Procedure 37(b)(2) confers broad discretion upon the Court to sanction parties for discovery abuses. *See, Jardien v. Winston Network, Inc.,* 888 F.2d 1151, 1156 (7th Cir. 1989); *Quela v. Payco-General American Credits,* No. 99 C 1904, 2000 WL 656681, at *6 (N.D. Ill. Mar. 26, 2000). Rule 37 sanctions are "available to penalize balky litigants and to deter others who might otherwise ignore discovery orders." *Philips Med. Systems Int'l v. Bruetman,* 982 F.2d 211, 214 (7th Cir. 1992). Rule 37 authorizes courts to: 1) strike pleadings; 2) refuse to permit an offending party to contest certain facts or proceed on certain claims; and 3) render a default judgment. *Suchon v. Meyer Tool & Manufacturing, Inc.,* 1998 WL 155821, at *2 (N.D. Ill. April 1, 1998).

In determining the appropriate sanction, a court is not required to select the least drastic sanction. *Newman v. Metropolitan Pier & Exposition Auth.,* 962 F.2d 589, 591 (7th Cir. 1992). However, sanctions imposed under Rule 37 must be both proportionate and related to the discovery violation at issue. *Crown Life Ins. Co. v. Craig,* 995 F.2d 1376, 1382 (7th Cir. 1993). Where less severe sanctions have proved unavailing, a court may enter a default judgment against a party that violates discovery orders willfully and in bad faith. *In re Golant v. Levy,* 239 F.3d 931, 936, n.1 (7th Cir. 2001).

14

## II. Compuware's Violation of This Court's Discovery Orders Warrants Sanctions.

Blue Cross contends that sanctions are warranted because: 1) Compuware violated the Court's October 26, 2001 Order directing Compuware to identify its trade secrets; 2) Compuware failed to produce its third-party licensing agreements, as directed by the Court on November 30, 2001; and 3) Compuware's ultimate production of these materials comes too late and is insufficient to comply with the Court's March 6th ruling ordering Compuware to identify its trade secrets and produce its third-party licensing agreements.

The Court agrees that Compuware has violated its discovery orders, and addresses each of Blue Cross' contentions in turn.

### A. Trade Secret Identification

The Seventh Circuit has clearly stated that a party alleging that its trade secrets have been misappropriated bears the burden of identifying its trade secrets with specificity. *See, e.g., Minnesota Mining & Mfg. Co. v. Pribyl*, 259 F.3d 587, 595 n. 2 (7th Cir. 2001). "Because the purpose of trade secret law is to encourage innovation and development, protection should not be extended beyond the limits needed to protect genuine trade secrets." *Id.; Composite Marine v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir. 1987).

Despite this well-established rule, Compuware has dragged its feet with regard to identifying its trade secrets. Compuware initially asserted that each of the software programs, in and of themselves, were trade secrets. The gist of Compuware's position was that, since its software products were the subject of a confidentiality provision in its licensing agreement with Blue Cross, the Court should simply accept Compuware's allegation that Blue Cross and Unitech must have appropriated trade secrets when Blue Cross allegedly violated the confidentiality provision of the licensing agreement.

But, of course, this is not the law. *See Minnesota Mining & Manufacturing*, 259 F.3d at 595 n.2 ("it is not enough for a plaintiff to point to broad areas of technology and assert that something there must have been secret and misappropriated."); *Thermodyne Food Serv. Prods., Inc. v. McDonald's Corp.*, 940 F. Supp. 1300, 1305 n.4 (N.D. Ill. 1996). And the Court informed Compuware of as much during the October 26, 2001 hearing, and directed Compuware to specifically identify its trade secrets. The Court warned Compuware that "to the extent that your client is aware as to specific trade secrets that were misappropriated . . . you have to identify it" and that "under Rule 11. . . you can't just come out and say that . . . since our theory is that the other side didn't have the right to access our programs, our programs themselves are the trade secrets.' You have got to be

more specific than that." Trns. of 10/26/01 Hearing at pp. 52, 54.

In response to the Court's October 26th ruling, Compuware submitted its Supplemental Response, which failed to adequately identify its trade secrets. Instead, the Supplemental Response listed the various functions of its software products. Compuware conceded that Blue Cross would require an expert witness to decipher its submission, as well as access to various reference materials including source codes.

Clearly, this submission did not satisfy the Court's October 26th Order, requiring Compuware to specifically identify the trade secrets that Blue Cross and Unitech had allegedly misappropriated. Given the state of the law, the Court's warning during the October 26th hearing, and Compuware's Supplemental Response, the Court can only conclude that either: 1) Compuware was merely attempting to at least superficially comply with this Court's Order, while continuing to frustrate Blue Cross' ability to defend itself in this lawsuit; or 2) Compuware was not aware of what its trade secrets were. Neither reason justifies Compuware's failure to comply with this Court's discovery order.

The Court acknowledges that Compuware's most recent submission appears to satisfy its obligation to identify its trade secrets. However, by failing to produce this material until less than two weeks before the close of discovery,

Compuware severely prejudiced Blue Cross' ability to chart a course for discovery and its defense in this case. If Compuware had disclosed its purported trade secrets in a timely manner, Blue Cross' defense might have consisted solely of attacking Compuware's claim that this information is not generally known in the field. Such a tactical decision would, of course, impact Blue Cross' decisions with regard to which witnesses to depose and what experts to hire.

By waiting until the last minute to make this disclosure, Compuware has required Blue Cross to prepare a defense on all fronts and, perhaps, unnecessarily increased Blue Cross' costs. Thus, the Court easily concludes that Compuware should pay not only Blue Cross' fees and expenses in preparing its Motions, but should also pay the $10,000 fine suggested by Blue Cross.

With respect to the nine software products that were not dissected in Compuware's March 18, 2002 filing, the Court readily concludes that dismissal with prejudice is warranted. Compuware has not met its burden of specifically identifying the trade secrets of nine of the twelve software products identified in its Complaint. Because it is the plaintiff's obligation to identify its trade secrets in such a case, *see IDX Sys. Corp. v. Epic Sys. Corp.,* 165 F. Supp.2d 812, 817 (W.D. Wis. 2001), the Court recommends dismissing Compuware's claims with respect to these software products with prejudice.

## Production of Licensing Agreements

Compuware's production of its third-party licensing agreements is clearly a case of too little, too late. With approximately two weeks left before the close of discovery, Compuware produced to Blue Cross the CDs and microfiche containing all of its North American licensing agreements. Almost five months after this Court ordered them to do so, Compuware has failed to produce even one hard copy of its third-party license agreements.

Compuware contends that this delay was caused by Blue Cross' refusal to confirm that it would pay its portion of the copying costs. The Court strongly disagrees that such a concern warranted Compuware's decision to disregard the Court's Order. As the Court stated during the March 6th hearing, the appropriate course of action would have been for Compuware to produce the documents that the Court had ordered it to produce, and to return to the Court in the event that Blue Cross subsequently refused to pay its share. The Court's November 30th Order cannot be read to make Compuware's legal obligation contingent upon Blue Cross' payment of copying costs up front.

The Court is convinced that Compuware is well aware that it has put Blue Cross in an extremely difficult position. Nevertheless, this does not prevent Compuware from arguing out of both sides of its mouth. Compuware concedes that it would not

have been able to produce hard copies of its contract within one week, which is why it produced only its CDs and microfiche.[6] Yet, Compuware asks the Court to believe that Blue Cross has not been severely prejudiced, even though Blue Cross must not only review and copy the thousands of documents from the CDs and microfiche, but also prepare for depositions, within two weeks.

Most troubling, however, are Compuware's blatant misrepresentations regarding the production of these third-party licensing agreements. During the October 26, 2001 hearing, the Court specifically directed Compuware to submit a sworn affidavit from a "high official . . . who has the knowledge as to what it would take to get this information." Trns. Of 10/26/01 Hearing, at p. 29.

Compuware identified Mr. Wojick, its Director of Contracts and Negotiations, as the Compuware officer with the requisite knowledge and submitted his affidavit on the issue of burdensomeness. Mr. Wojick stated that producing these third party licensing agreements "would take three people at least three weeks, working full time, to identify the files containing

---

[6] The issue is not, as Compuware would have the Court believe, whether parties frequently produce documents on CDs during discovery. Such a production might have been acceptable if Compuware had made a timely production of its agreements and enabled Blue Cross sufficient time to identify and copy the agreements located on the CDs and microfiche. And while Compuware did produce the two CDs to Blue Cross in December, 2001 for review, Blue Cross was right to reject them as inadequate, as they contained only a percentage of the agreements requested.

relevant license agreements, and then to remove, copy and restore the license agreements and schedules." Wojick Aff. ¶ 8. Mr. Wojick also complained that this process would substantially interfere with Compuware's daily operations.

Yet, Mr. Wojick – Compuware's Director of Contracts and Negotiations, a corporate officer who was held out to have the requisite knowledge of these matters – never once mentioned that all or some of these agreements might be available on CDs or microfiche. Of course, revealing this information would have substantially undercut Compuware's contention that producing these agreements would be unduly burdensome.

The Court might be reluctant to conclude that the information in Mr. Wojick's affidavit was a blatant misrepresentation, made for the purpose of securing a tactical advantage, were it not for Compuware's subsequent trysts with the truth. Specifically, Compuware represented to Blue Cross in February that it was in the process of copying all of its third-party licenses from the CDs, and that IKON would be sending Blue Cross its share of the bill. Just over one week later, Compuware admitted, without explanation, that it had not, in fact, started copying the licensing agreements.

The content of the CDs and Compuware's extremely belated disclosure of the microfiche are also highly suspicious. The Court wonders how it is possible that Compuware was unaware that

the microfiche, which contained all of the information that Blue Cross had been seeking, existed until only three weeks before the close of discovery. The Court also finds it more than a bit coincidental that Compuware just happened to have all of their licensing agreements for the File-AID, Abend-AID, and Xpediter programs available on two CDs. These circumstances suggest that, while Compuware was aware all along that all of the agreements were available on microfiche, it hoped to deter Blue Cross from discovering all of its licensing agreements by freely offering the most relevant agreements contained on two CDs, and then made it extremely difficult to discover the remaining agreements.

Once again, the Court finds that Compuware's behavior warrants requiring it to pay not only Blue Cross' fees and costs in filing its First and Second Motions for Rule to Show Cause and for Sanctions, but also the $10,000 sanction as well. The Court finds that Compuware blatantly disregarded Court Orders, and misrepresented the truth to gain a tactical advantage during discovery.

With regard to Blue Cross' request for the severest of sanctions, dismissal with prejudice, the Court finds that such a sanction would only be warranted if Blue Cross could demonstrate that Compuware's late disclosures severely prejudiced its defense. Whether Blue Cross could make such a showing depends, largely, upon whether the district court has held firm to the

previously imposed discovery cut-off date of March 29, 2002, or whether that discovery deadline has been extended. If the district court has agreed to extend the discovery deadline to permit Blue Cross to adequately prepare its defense, it is unlikely that Blue Cross could make the requisite showing, despite the Court's finding that Compuware's conduct was egregious and intentional.

## CONCLUSION

Compuware insists that it was the victim of Blue Cross' scheme to violate their licensing agreement by enabling Unitech to access Compuware's software on Blue Cross' mainframe, and profiting from it at Compuware's expense. While, at this stage of the proceedings, the Court presumes that Compuware's allegations are true, this does not excuse Compuware from having to identify its trade secrets or from complying with this Court's discovery orders. The Court finds that Compuware violated its Orders and misrepresented the truth on more than one occassion in an effort to gain an unfair advantage over its adversaries.

The Court is of the opinion, therefore, that Blue Cross' First and Second Motions should be granted and sanctions should be imposed. The Court recommends that Compuware be ordered to pay Blue Cross' costs and fees for compiling and presenting these Motions, and to pay the $10,000 fine suggested by Blue Cross. While the Court is of the opinion that dismissing the entire case

with prejudice is contingent upon Blue Cross' ability to show that it is severely prejudiced by Compuware's belated and incomplete disclosures, it recommends dismissing Compuware's claims with respect to the nine products abandoned in Compuware's March 18, 2002 submission.

DATED: March 29, 2002     RESPECTFULLY SUBMITTED:


ARLANDER KEYS
United States Magistrate Judge


Counsel have ten days from the date of service to file objections to this Report and Recommendation with the Honorable Elaine Bucklo.  *See* FED. R. CIV. P. 72(b); 28 U.S.C. § 636(b)(1). Failure to object constitutes a waiver of the right to appeal. *Egert v. Connecticut Gen. Life Ins. Co.*, 900 F.2d 1032, 1039 (7th Cir. 1990).